# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3290 | **DATE** | 6/9/2003 |
| **CASE TITLE** | Voices for Choices et al vs. Illinois Bell Telephone Co et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■   [Other docket entry] **ENTER MEMORANDUM OPINION:**   We grant the motions for temporary restraining order and preliminary injunction. Defendants are preliminarily enjoined from implementing sections 13-408 and 13-409 of Illinois' Public Utilities Act (220 ILCS 5/13-408 and -409).

(11) ■   [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | JUN 0 9 2003 | |
| ✓ | Notified counsel by telephone. | | date docketed | 61 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | CLERK | date mailed notice | |
| SCT | courtroom deputy's initials | 03 JUN -9 PM 4: 11 | | |
| | | FILED | mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VOICES FOR CHOICES; AT&T                          )
COMMUNICATIONS OF ILLINOIS, INC.; MCI  )
METRO ACCESS TRANSMISSION SERVICES,  )
LLC; and ASSOCIATION FOR LOCAL            )
COMMUNICATIONS SERVICES,                     )
                                                               )
                         Plaintiffs,                        )
                                                               )
            vs.                                               )        03 C 3290
                                                               )
ILLINOIS BELL TELEPHONE CO., INC. d/b/a  )
SBC Illinois; AMERITECH CORP. d/b/a SBC  )
Midwest; and EDWARD C. HURLEY, ERIN M.  )
O'CONNELL-DIAZ, LULA M. FORD, MARY       )
FRANCES SQUIRES, and KEVIN K. WRIGHT,  )
in their capacities as Commissioners of the Illinois  )
Commerce Commission and not as Individuals,  )
                                                               )
                         Defendants.                       )



DOCKETED
MAY   9 2003

## **MEMORANDUM OPINION**

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on a motion for temporary restraining order

or preliminary injunction brought by Plaintiffs Voices for Choices, AT&T

Communications of Illinois, Inc. ("AT&T"), MCI Metro Access Transmission

Services, LLC ("MCI"), Associations for Local Telecommunications Services,

McLeodUSA Telecommunications Services, Inc., TDS Metrocom, LLC, Mpower

Communications Corp. d/b/a Mpower Communications of Illinois, Citizens Utility Board, Talk America Inc., XO Illinois, Inc., Globalcom, Inc., and Forte Communications, Inc. Plaintiffs bring the motion against Defendants Illinois Bell Telephone Co., Inc. d/b/a SBC Illinois and Ameritech Corp. d/b/a SBC Midwest (collectively "SBC") and against Illinois Commerce Commission ("ICC") commissioners Edward Hurley, Erin O'Connell-Diaz, Lula Ford, Mary Frances Squires, and Kevin Wright. For the reasons set forth below we grant the motion.

## BACKGROUND

On May 9, 2003, the Illinois legislature, with the governor's signature, enacted sections 13-408 and 13-409 to Illinois' Public Utilities Act. Plaintiffs contend that these new provisions, sections 408 and 409, violate the Supremacy Clause of the U.S. Constitution, U.S. CONST. art. VI, § 1, because they conflict with the Federal Telecommunications Act of 1996 (the "FTA"), 47 U.S.C. § 251-261, and related FCC regulations. Thus, a thorough explanation of the purpose and framework of the FTA is necessary. In *MCI Telecommunications Corp. v. Illinois Bell Telephone Co.*, 222 F.3d 323 (7th Cir. 2000), Circuit Judge Ripple provides just such a thorough explanation:

> Congress enacted the 1996 Telecommunications Act "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and

encourage the rapid deployment of new telecommunications technologies." Pub.L. No. 104-104, 110 Stat. 56, 56 (1996). The Act "fundamentally restructures local telephone markets" by transforming the "long-standing regime of state-sanctioned monopolies" into a competitive market. *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S. Ct. 721, 142 L.Ed.2d 835 (1999). Congress recognized that, even after the removal of regulatory restrictions on competition, significant economic barriers would remain to block entry into local telephone markets. Prospective market entrants would face the cost of duplicating an incumbent provider's local network infrastructure. To remove this economic barrier, the Act essentially requires incumbent local exchange carriers ("LECs") [such as SBC] to share their networks with competitors [such as Plaintiffs]. Section 251 of the Act requires incumbent LECs to allow new entrants to interconnect with existing local networks, to lease elements of existing local networks at reasonable rates, and to purchase the incumbents' services at wholesale rates and resell those services to retail customers. *See* 47 U.S.C. § 251 (Supp. II 1996).

Section 252 sets out the process by which incumbent LECs and prospective carriers establish interconnection agreements. First, incumbent LECs and prospective carriers must negotiate in good faith to reach voluntary interconnection agreements. At any time during the negotiations, a party may ask the appropriate state commission to participate as a mediator in the negotiations. *See id.* § 252(a)(2). If negotiations prove unsuccessful, subsection 252(b) provides for compulsory arbitration of any open issues. During the period from the 135th to the 160th day after an incumbent LEC receives a request for negotiation, any party to the negotiation may petition the state commission to arbitrate any open issues. *See id.* § 252(b)(1). Sections 251 and 252 establish certain standards that the state commission must follow in resolving open issues by arbitration and in imposing conditions on the parties. The state commission is also bound by Federal Communications Commission ("FCC") regulations issued pursuant to § 251.

Subsection 252(e) requires any interconnection agreement reached by negotiation or arbitration to be submitted to the state commission for approval and specifies the grounds on which a state commission can reject an agreement. Specifically, state commissions may reject

negotiated interconnection agreements only if the commission finds (1) that the agreement discriminates against a carrier that is not a party to the agreement or (2) that implementation of the agreement (or a part thereof) would be inconsistent with "the public interest, convenience, and necessity." *Id.* § 252(e)(2)(A). A state commission may reject an arbitrated interconnection agreement only if the agreement (or part thereof) (1) does not meet the requirements of § 251 and its implementing regulations or (2) fails to meet the pricing standards set forth in subsection 252(d). *See id.* § 252(e)(2)(B).

Subsection 252(e)(5) further provides that, if a state commission fails to carry out any of its responsibilities under § 252, then the FCC must assume responsibility for the proceeding and act for the state commission in carrying out its functions. An implementing regulation to § 252 provides that a state commission "fails to act" for purposes of subsection 252(e)(5)-- thus prompting the FCC to step in and assume the state commission's responsibilities--if it fails to respond within a reasonable time to a request for mediation or a request for arbitration, or if it fails to complete an arbitration within the established time limits. *See* 47 C.F.R. § 51.801(b). A state commission will not be deemed to have failed to act, however, if it merely fails to approve or reject an agreement within the established time limits. *See id.* § 51.801(c). In such a case, the agreement will be deemed approved. *See* 47 U.S.C. § 252(e)(4) (Supp. II 1996).

Therefore, subsections 252(e)(1), (e)(4), and (e)(5), taken together and read in conjunction with the FCC regulations, create a scheme that provides regulatory oversight of interconnection agreements, either by a state commission or by the FCC in the state commission's place.

. . .

The Act provides that federal district courts have exclusive jurisdiction to review FCC or state commission actions relating to interconnection agreements. In subsection 252(e)(4), Congress expressly eliminated state court jurisdiction to review actions of state commissions in approving or rejecting agreements under § 252. Moreover, subsection 252(e)(6), titled "Review of State commission actions," provides that, whenever a state commission fails to act, the exclusive remedies for that

failure to act will be proceedings by the FCC and any judicial review of the FCC's actions. Subsection 252(e)(6) also provides that, "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 [and section 252].

*Id* at 328-329.

In setting rates for the lease of network elements (in an arbitrated dispute rather than a freely negotiated agreement), the state commission must take into account the incumbent LEC's cost of providing the elements on a "forward-looking" basis only. 47 C.F.R. § 51.505. The FCC calls this the "total element long-run incremental cost" or TELRIC. 47 C.F.R. § 51.505(a)(1). The TELRIC "of an element should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers." 47 C.F.R. § 51.505(b)(1). In calculating the TELRIC, the incumbent LEC's embedded costs may not be considered. 47 C.F.R. § 51.505(d)(1). "Embedded costs are the costs that the incumbent LEC incurred in the past and that are recorded in the incumbent LEC's books of accounts". *Id.* In other words, incumbent LECs can only recover costs that an efficient provider would incur in providing the network elements irrespective of the costs of their actual practices.

SBC is an incumbent LEC that owns and operates local telecommunications network infrastructure in Illinois. Under the FTA, SBC is required to lease access to its infrastructure, also called unbundled network elements or UNEs, to competing LECs "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title." 47 U.S.C. § 251(c)(3). Section 252 contemplates the formation of interconnection agreements between incumbent LECs and competing LECs that govern the rates on which competing LECs lease UNEs from the incumbent LECs. Interconnection agreements may be reached through negotiation between the parties or through arbitration at the state commission, here the ICC, (or the FCC if the state opts out of the FTA framework). 47 U.S.C. § 252(a)-(b). SBC, having failed to negotiate higher UNE rates with the competing LECs, initiated an ICC arbitration. Before the ICC could make a final determination, however, the Illinois legislature enacted section 408. Section 408 abated the ongoing ICC arbitration and instructed the ICC to institute a new proceeding to adjust UNE rates based on specific instructions contained in section 408. 220 ILCS 5/13-408. Section 408 further instructs the ICC to adjust the UNE rates by June 9. 220 ILCS 5/13-408(c). The specific instructions are to adjust rates based on changes to two criteria: fill factors and depreciation. 220 ILCS 5/13-408(a)-(b).

A fill factor is a measure of the percentage of an incumbent LEC's network capacity that is actually used. For example, a fill factor of 60% means 60% of the network capacity is being utilized while 40% remains idle. Fill factors are considered in setting UNE rates because the incumbent LEC must recover the costs of actual fill and idle fill. Again, for example, at an approved fill factor of 60%, UNE rates are set to allow an incumbent LEC to recover its costs for five telephone lines for every three lines that are leased. The rationale for this is that the cost in providing three lines to a competing LEC includes the cost of two idle lines for a total of five lines. Under TELRIC, fill factors are supposed to be based on the most efficient use of the network on a forward-looking basis. 47 C.F.R. § 51.505(b)(1). The Illinois legislation, however, instructs the ICC to employ fill factors based on SBC's actual fill, rather than on the fill of an efficient incumbent LEC. 220 ILCS 5/13-408(a).

Depreciation is a more familiar term. In setting UNE rates, the ICC must employ economic depreciation costs that are "efficiently incurred" and cannot consider embedded costs. 47 C.F.R. § 51.505(c)(1) and (d)(1). Thus, like fill factors, depreciation must be based on a hypothetical efficient incumbent LEC's practices rather than SBC's actual practices. The Illinois legislation, however, instructs the ICC to employ the depreciation costs that SBC reports in its books of accounts as submitted to the SEC. 220 ILCS 5/13-408(b).

Plaintiffs contend that the Illinois legislation violates federal law and, if not enjoined by June 9, will cause them irreparable injury for which no adequate remedy at law exists.

## LEGAL STANDARD

Plaintiffs have moved for a either a temporary restraining order or a preliminary injunction. Since both sides have been heard fully on the merits of the motion, both in writing and orally, in an *inter partes* fashion, we treat the motion as one for a preliminary injunction. In any event, "[t]he standards for a temporary restraining order and a preliminary injunction are identical." *Frederick Atkins, Inc. v. Carson Pirie Scott & Co.*, 1999 WL 1249342, *1 (N.D. Ill. Dec. 13, 1999). To be entitled to a preliminary injunction, Plaintiffs must demonstrate:

> (1) that [they have] a reasonable likelihood of success on the merits of [their] claim;
> (2) that no adequate remedy at law exists;
> (3) that [they] will suffer irreparable harm if the preliminary injunction is denied;
> (4) that the irreparable harm [they] will suffer without preliminary injunctive relief outweighs the irreparable harm the nonmoving party will suffer if the preliminary injunction is granted; and
> (5) that the injunction will not harm the public interest.

*Id* (citing *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 726 (7th Cir. 1998)).

# DISCUSSION

## I.  Preliminary Injunction

### A.  <u>Likelihood of Success on the Merits</u>

The Illinois legislation conflicts with federal law in several respects.  The legislation orders the ICC to determine fill factor and depreciation costs based on SBC's actual fill and depreciation as accounted to the SEC.  FCC Rule 51.505 clearly bars any such emphasis on the incumbent's actual practices.  47 C.F.R. § 51.505. Under TELRIC, element costs can only be based on a hypothetical efficient provider's costs determined on a forward-looking basis.  *Id*.  The FCC rule instructs the ICC to look at a hypothetical efficient provider's costs rather than SBC's actual costs.  47 C.F.R. § 51.505.  The Illinois legislature then tells the ICC to use SBC's actual costs as the most reasonable projection of a hypothetical efficient provider's costs.  220 ILCS 5/13-408(a)-(b).  Thus, section 408 completely reads out the hypothetical efficient provider standard from TELRIC.  The Illinois legislation has, by fiat, rendered TELRIC irrelevant with respect to two key factors in the rate setting exercise.

As the FTA is designed to foster competition, it is not surprising that a delegation of federal authority to a state commission, with all of its attendant experience in these matters, was made to perform the adjudicatory function with respect to interconnection agreements.  Possessed of professional staffs and expertise,

it was the logical unit of state government to play the key arbitral role when agreements were not forthcoming. Not coincidently and, in addition to their expertise, proceedings are conducted in an adversarial process designed to permit all interested parties the opportunity to make their own respective cases and oppose their adversaries' positions. The FTA expressly designates these state commissions and agencies and not state legislatures to perform the arbitral function.

With due respect, it cannot be said that the Illinois General Assembly is possessed of comparable expertise and experience in these rate setting matters and arbitrations. Nor can it be said that the history of the Illinois legislation under challenge reflects the procedural rights and safeguards which generally attend hearings before state commissions. No record need be made of reasons legislators may have for the particular exercise of their ballot privileges. In contrast, the orders reflecting the results of the Illinois Commerce Commission are earmarked by the evidence considered, presentations made by parties, and the reasons for Commission decisions. It is little wonder that the state commissions which are charged with similar duties in state rate-setting matters were those the federal government saw fit to empower in hearing and resolving federal issues. A clear usurpation of authority took place here in a way neither authorized nor contemplated by the FTA when the Illinois Legislature decreed fill and depreciation rates, matters heretofore determined by the ICC.

In Section 252 of the FTA, Congress delegated arbitral powers to state commissions, not to the states themselves. 47 U.S.C. § 252. Specifically enumerated is the state commission's power to "establish any rates for interconnections, services, or network elements". 47 U.S.C. § 252(c)(2). For FTA purposes, state commission is defined as "the commission, board, or official (by whatever name designated) which under the laws of any State has regulatory jurisdiction with respect to intrastate operations of carriers." 47 U.S.C. § 153(41). It is undisputed that the ICC is the state commission in Illinois to which the FTA grants the rate-making powers under section 252.

The Illinois legislation displaces much of the ICC's rate-making authority and substitutes its own. 220 ILCS 5/13-408(a)-(b). SBC maintains that, because the ICC is a creature of the legislature, the legislature is free to usurp the ICC's powers. SBC cites case law for the propositions that all of the ICC's "power is derived from the legislature" and that the ICC's primary task is "to do what is reasonably necessary to accomplish the [Illinois] legislature's objective." (SBC Opp. at 16 (citing *Business and Prof'l People for Pub. Interest v. Illinois Commerce Comm'n*, 585 N.E.2d 1032, 1039 (Ill. 1991), and *Abbott Labs. v. Illinois Commerce Comm'n*, 682 N.E.2d 340, 347 (Ill. App. Ct. 1997).) Neither of the cases SBC cites dealt with the telecommunications industry or the ICC's role under the FTA. The ICC's rate-making authority with

-11-

respect to the rates an incumbent LEC may charge competing LECs for use of UNEs, is derived from Congress, not the Illinois legislature; the ICC's task is to accomplish Congress' objective in enacting the FTA. *MCI Telecommunications*, 222 F.3d at 341 ("Congress has expressed unmistakably that, under the 1996 Telecommunications Act, states could participate in the *federal regulatory function* delegated to them *by the federal government*") (emphasis added). Additionally, section 252(e)(4) of the FTA demonstrates that Congress was bestowing federal, as opposed to state, rate-making powers onto the various states' commissions. Section 252(e)(4) decrees that state courts have *no jurisdiction* to review their own state commissions' actions in approving or rejecting interconnection agreements. 47 U.S.C. § 252(e)(4). Clearly, the ICC's rate-making power in this context is derived from Congress, and not from the Illinois legislature. As such, SBC's argument that that which giveth can take away falls by the wayside.

In section 252, the FTA mandates the procedure for determining UNE rates, whether conducted by the ICC at Illinois' option or by the FCC should Illinois decline the option. Under section 252, parties may freely negotiate, and enter into, interconnection agreements. 47 U.S.C. § 252(a). If the parties fail to resolve any or all issues, a party may petition the ICC for arbitration of those "open issues". 47 U.S.C. § 252(b)(1). The Illinois legislation completely circumvents this procedure by

(1) undermining the FTA's contemplation of a 134-day period of voluntary negotiation by allowing SBC to go straight to the legislature,[1] and (2) resolving contested issues in SBC's favor without arbitration.  Not only does the Illinois legislation circumvent the arbitration procedure contemplated by the FCC, it actually abated just such an arbitration that was ongoing at the time the legislation was enacted.  220 ILCS 5/13-408(c).  Moreover, it is of no moment that the Illinois legislation decrees that the sham ICC proceeding that it directs to take place "be deemed" an arbitration for FTA purposes.  *See* 220 ILCS 5/13-408(c)  A state legislature cannot prevent federal court review of actions governed by a federal statute by decreeing that the federal statute has been honored.

Having the issues resolved in their favor by the legislature rather than in an ICC arbitration allowed SBC to avoid its burden of proof under FCC regulation 51.505. Not only is an incumbent LEC required to arbitrate contested element rates, it carries the burden of proof in demonstrating that a rate it seeks does "not exceed the forward-looking economic costs of providing the element, using a cost study that complies with the [TELRIC] methodology . . .." 47 C.F.R. § 51.505(e).  The Illinois legislation

---

[1]  This did not actually occur here.  SBC did not go to the legislature until after the negotiation period ended and the arbitration proceeding had begun.  Nevertheless, upholding this legislation would necessarily condone going straight to the legislature at any time and, therefore, would undermine the 134-day period of voluntary negotiation.

commands the ICC to set fill factor and depreciation rates without arbitration and regardless of whether SBC can or does meet its burden of proof under 47 C.F.R. § 51.505(e).

To summarize, the Illinois legislation which added sections 13-408 and 13-409 to the Illinois Public Utilities Act clashes with federal law embodied in the 1996 Telecommunications Act and related regulations in the following material ways:

1.    The methodology to be used in federal rate determinations is eviscerated – TELRIC is effectively repealed;

2.    The incumbent LEC no longer has a burden to prove its rates, terms and conditions are just and reasonable;

3.    The proceeding mandated to take place and "deemed" to be an arbitration is, in truth, specious and hollow;

4.    The will of the Legislature, reasoned or otherwise, displaces the expertise of the ICC;

5.    Procedural safeguards, designed to insure fairness in rate-setting exercises, are eliminated; and

6.    The absence of a record of proceedings in two key areas renders impossible meaningful federal judicial review.

For all of the foregoing reasons, we find Plaintiffs have a strong likelihood of success on the merits of their Supremacy Clause claims.

B.     No Adequate Remedy at Law & Irreparable Injury

Plaintiffs argue that they will be irreparably harmed in a manner for which they have no adequate remedy at law if the ICC implements new rates as directed by the Illinois legislation. We agree. The substantially higher rates, which are projected to go into effect June 9, will immediately effect all lines leased by competing LECs in excess of 35,000. Under section 409, there is a two year stay of increased rates for the first 35,000 lines that each competing LEC leases. 220 ILCS 5/13-409(a). Only MCI and AT&T lease more than 35,000 lines–they will be immediately effected by the rate hikes. The remaining Plaintiffs are relatively smaller competitors that will be allowed to retain temporarily the same rates at their present size because they lease less than 35,000 lines. Nevertheless, the smaller competing LECs are clearly discouraged from expanding beyond 35,000 lines. Thus, to the extent the smaller competing LECs are capable of expanding beyond 35,000 lines, they will have to choose between forgoing the expansion or proceeding with the expansion and paying higher rates. Either way, they suffer irreparable harm. Additionally, the larger competing LECs may have to leave the Illinois local telephone market while the smaller competing LECs could suffer a worse fate. Of course, SBC vehemently attacks these predictions. Even if we

-15-

take SBC's factual allegations–that the competing LECs are making windfalls under the present pricing scheme and will continue to get by with profitable margins under the proposed rate hikes–as true, the competing LECs will still suffer an injury for which no remedy exists if the rates are permitted to increase and are later invalidated upon a full disposition of this case on the merits. In such a scenario, we are unaware of any cause of action that will be available to the competing LECs to recoup the excess portion of the rates which they paid SBC once it is established that the rates were invalidly adjusted. Although SBC claims to have offered to "true up" the difference in rates should the Illinois legislation ultimately be overturned, SBC fails to convince us that this offer translates into a cause of action that would ensure Plaintiffs an adequate remedy at law. (According to Plaintiffs, the offer to "true up" has only been made in SBC's brief in opposition to the present motion, and there is no guarantee that SBC will adhere to its word.)

C.    Balancing the Harms and the Public Interest

Enjoining Defendants from implementing the Illinois legislation will harm SBC less than Plaintiffs would be harmed if we denied the motion. First, SBC will be permitted to pursue rate changes under the provisions of the FTA as always–we are not enjoining rate changes generally, only rate changes as directed by the Illinois legislature. Secondly, SBC may move this court to set an appropriate bond to protect

its financial interests should the Illinois legislation ultimately be found valid. On the other side of the coin, if we deny the motion, at least two of the Plaintiffs will be forced to pay significantly higher rates immediately, monies which may never be recoverable even if the Illinois legislation is ultimately invalidated. Additionally, Plaintiffs may feel compelled to freeze their investment and advertising in the Illinois market, and the smaller competing LEC's may withdraw from the market altogether.

The public interest factor also weighs heavily in favor of enjoining the legislation. The legislation is anti-competitive. It will make it harder for competitors to compete with SBC. Less competition means less choices for consumers, and less choices for consumers ultimately leads to higher prices.

## II. Power to Hear This Case

Defendant ICC commissioners oppose this motion on non-substantive grounds only. They contend that they are immune from suit because they are acting (or will act) in a legislative nature and that the suit is not yet ripe. These issues are entwined with one another and will be dealt with together.

First, there is clearly no 11th Amendment immunity available to the commissioners with respect to the allegations that the legislation violates federal law. *MCI Telecommunications*, 222 F3d at 343-44 (holding that states that voluntarily choose to have their state commission, rather than the FCC, regulate FTA matters

-17-

implicitly waive 11th Amendment immunity). The commissioners do not rely on 11th Amendment immunity but rather on what has been termed legislative immunity in a string of cases beginning with *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210 (1908). The idea behind this doctrine is that state legislatures and their subordinate legislating bodies cannot be enjoined from legislating. *Id* at 229-30. State laws can certainly be invalidated and/or enjoined (for good reason) once passed in final form but the federal courts cannot keep watch on state legislatures to prevent them from passing invalid laws in the first instance. *Id*. This is where the ripeness issue becomes entwined. The commissioners argue that since the rates have not yet been set, there is no final legislation to invalidate. To enjoin the ICC from carrying out its rate-making function, it is argued, would intrude on state legislating, which is immune from suit until complete.

Under *Prentis*, rate-making is a legislative function, and the states are immune from suit during the legislative process. *Id* at 226, 232. In *Prentis*, several railroad companies sought to enjoin the Virginia State Corporation Commission from publishing or taking further steps to enforce a certain order fixing passenger rates on trains. *Id* at 216. The railroad companies alleged that enforcing the rates would deprive them of property without due process in violation of the 14th Amendment. *Id*. Under Virginia law, before the order fixing the rates could go into effect, the Virginia

commission had to give notice (by four weeks' publication in a newspaper) of the substance of the contemplated action and of a time and place when the commission would hear objections and evidence against it. *Id* at 224.

*Prentis* and its progeny do not apply to the present suit for two reasons. First, by enjoining the ICC commissioners, we are not interfering with a state legislative process. Even if the ICC had any real discretion to set rates in light of the Illinois legislation, the ICC would not be acting as a *state* rate-making body but as a *federal* rate-making body. *See MCI Telecommunications*, 222 F.3d at 341 ("Congress has expressed unmistakably that, under the 1996 Telecommunications Act, states could participate in the *federal regulatory function*" of setting rates) (emphasis added).

Secondly, unlike in *Prentis*, in the present case federal law has already been violated. In *Prentis*, the railroads sought to enjoin further steps toward the implementation of fixed passenger rates which they believed would be unconstitutional. *Prentis*, 211 U.S. at 216. Thus, at the time the railroads sued, no violation of federal law had occurred. In the present situation, several provisions of FTA and FCC Rule 51.505 have already been violated by the Illinois legislation. Even though the ICC has not set any rates, the Illinois legislature has already abated an on-going federal rate-making arbitration and made findings of fact in favor of SBC without requiring SBC to meet its burden of proof on these issues. Additionally, the

ICC is in the midst of a procedurally unauthorized rate-making proceeding. Furthermore, it is clear from the ICC administrative law judges' proposed order that the ICC intends to set UNE rates in violation of TELRIC. Unlike in *Prentis*, there remains no time and place when and where the ICC will hear objections and evidence against the proposed order.

## CONCLUSION

The Plaintiffs claim that the Illinois legislation sought to be enjoined is special interest legislation of the rankest sort, designed solely to benefit the incumbent local telephone monopolist in Illinois and twelve other states. It has been called a legislative fix to the sponsors' fear that the ICC might not agree with their view of the issues. The Plaintiffs assert that having only SBC's interests in mind necessarily retards and impedes the competitive climate, and departure from the market of some of SBC's competitors is likely to follow.

SBC, on the other hand, claims that it has, in fact, been subsidizing its competitors and that this Court's focus should be on the fairness of rates produced by the legislative change and not the manner in which the result is ordained. The fundamental problem with SBC's position is twofold. Its direct appeal to the Illinois legislature for rate relief is expressly contrary to federal law. If the ICC should act niggardly toward SBC in a way inconsistent with relevant evidence, the appeal must

be to the Federal District Court and not to the legislators of the state in which it may hold sway.

Additionally, the legislative process can be both inelaborate and unscientific when compared to the adjudicatory procedures mandated by state commissions in the conduct of their business. The ICC, and this Court, are perfectly capable of determining whether SBC has been forced to subsidize its competitors in some unlawful way such that its own competitive abilities have been compromised. There is no evidentiary or procedural record of like kind in legislative considerations, so there is no present basis to test SBC's thesis that it has been shortchanged lo these many years. The beauty of administrative and judicial proceedings include, among other things, standing to those who may be affected and an opportunity to be heard.

None of this discussion is intended to denigrate the legislative process, for the benefits produced by our system of government are obvious to all. But when a federal statute is enacted to expressly preempt a field and procedural mechanisms are elaborately set forth, state acts inconsistent with either the substantive or procedural federal law cannot stand. The rate issues which underlay the Illinois legislation have been declared by federal law to be adjudicatory in nature, not legislative. The action of the Illinois General Assembly in declaring the method by which fill factors and

depreciation rates are to be determined are an intrusion into federal law and are clearly inconsistent with it. As such, they cannot stand and must be enjoined.

Based on the foregoing analysis, we grant the motion. Defendants are preliminarily enjoined from implementing sections 13-408 and 13-409 of Illinois' Public Utilities Act (220 ILCS 5/13-408 and -409).

Charles P. Kocoras
Chief Judge
United States District Court

Dated: June 9, 2003